Filed 3/28/22 (unmodified opinion attached)

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| MONTEREY COASTKEEPER et al., | C090943 |
| Plaintiffs and Appellants, | (Super. Ct. No. 34-2017-80002655-CU-WM-GDS) |
| v. | |
| CENTRAL COAST REGIONAL WATER QUALITY CONTROL BOARD et al., | ORDER MODIFYING OPINION |
| Defendants and Respondents. | [NO CHANGE IN JUDGMENT] |

APPEAL from a judgment granting a petition for writ of mandate of the Superior Court of Sacramento County, James P. Arguelles, Judge. Affirmed.

Environmental Law and Justice Clinic; Helen H. Kang, Lucas Williams, Deborah A. Sivas and Susann M. Bradford for Plaintiffs and Appellants, Monterey Coastkeeper, California Sportsfishing Protection Alliance, Environmental Justice Coalition for Water, Pacific Coast Federation of Fisherman's Associations, Institute for Fisheries Resources,

California Coastkeeper Alliance, Santa Barbara Channelkeeper, Orange County Coastkeeper, and Inland Empire Waterkeeper.

California Rural Legal Assistance, Inc.; Marisol F. Aguilar; for Plaintiffs and Appellants, Fairmead Community and Friends and Planada En Acción.

Xavier Becerra, Attorney General, Robert W. Byrne, Senior Assistant Attorney General, Tracy L. Windsor, Supervising Deputy Attorney General, Taylor Rhodes, Sierra Arballo and Linda Gándara, Deputy Attorneys General for Defendants and Respondents, Central Coast Regional Water Quality Control Board, et al.

Kahn, Soares & Conway, Theresa A. Dunham, for East San Joaquin Water Quality Coalition; Spaletta Law; Jennifer Lynn Spaletta, for San Joaquin County Resource Conservation District, Kaweah Basin Water Quality Association, Tule Basin Water Quality Coalition, and California Farm Bureau Federation; Kari E. Fisher, for California Farm Bureau Federation as Amici Curiae on behalf of Defendants and Respondents

THE COURT:

It is ordered that the opinion filed herein on February 10, 2022, be modified as follows:

On page 1, line 2, change from "local water boards" to read "regional water boards."

On page 16, line 7, change from "local regional water boards" to read "regional water boards."

On page 17, line 18, change from "local and state boards" to read "regional and state boards."

On page 2, line 7, change reference from "13300" to read "13000 et seq."

On page 1, lines 2 to 3, and page 2, line 6, change references from "water permits" to read "waste discharge permits."

On page 4, lines 5 to 6, change from "The NPS Policy regulations require nonpoint source pollution control permits to include five mandatory key elements" to read "The NPS Policy regulations require nonpoint source control implementation programs to include five mandatory key elements."

On page 4, lines 19 to 20, change "challenged the State Board's 2017 Conditional Waiver" to read "challenged the Regional Board's 2017 Conditional Waiver."

On page 6, lines 2 to 4, change "The second cause of action related to the 2018 agricultural waste discharge permit issued by the Central Valley Regional Water Control Board (Central Valley Board) and the State Board's modification of the permit" to read "The second cause of action related to the 2012 agricultural waste discharge permit issued by the Central Valley Regional Water Quality Control Board (Central Valley Board) and the 2018 State Board's modification of the permit."

On page 7, lines 11 to 12, change "A permit for the Eastern San Joaquin Regional Board" to read "A permit for the Eastern San Joaquin River Watershed issued by the Central Valley Board."

3

On page 13, lines 7 to 8, change "State Board's 2018 Waste Discharge Requirements General Order No. RS-2012-0116, Order WQ 2018-002" to read "State Board's Order WQ 2018-0002."

Except for the modification set forth, the opinion previously filed remains unchanged.

The modification does not change the disposition.

_____\s\_____,
BLEASE, J.

We concur:

_____\s\_____,
RAYE, P.J.

_____\s\_____,
HULL, J.

Filed 2/10/22; Certified for Publication 3/7/22 (order attached) (unmodified opinion)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| MONTEREY COASTKEEPER et al., | C090943 |
| Plaintiffs and Appellants, | (Super. Ct. No. 34-2017-80002655-CU-WM-GDS) |
| v. | |
| CENTRAL COAST REGIONAL WATER QUALITY CONTROL BOARD et al., | |
| Defendants and Respondents. | |

Can a court, in an action for traditional mandamus and declaratory relief, in effect order the state and local water boards to comply with the law as it pertains to water permits under the Porter-Cologne Water Quality Control Act (Wat. Code,[1] § 13000 et seq. (Porter-Cologne Act))?  In this case, the answer is no.

---

[1] Undesignated statutory references are to the Water Code.

Appellants Monterey Coastkeeper (Coastkeeper) and others are dissatisfied with how the respondent State Water Resources Control Board (State Board) and the regional water boards, including respondent Central Coast Regional Water Quality Control Board (Central Coast Board), control water pollution resulting from agricultural runoff through the permitting process. Appellants filed an action seeking, among other things a declaratory judgment and writ of traditional mandamus regarding the water permits governed under section 13300. Specifically, the third cause of action in their first amended complaint sought traditional mandamus and declaratory relief regarding respondents' alleged failure to comply with the State Board's Nonpoint Source Pollution Control Policy (NPS Policy) in the permitting process, while the fourth cause of action sought traditional mandamus directing the State Board to comply with the public trust doctrine.

Appellants appeal from the trial court's sustaining of demurrer without leave to amend of their third and fourth causes of action. They contend the trial court erred regarding both the NPS Policy and public trust doctrine, and erred in denying them leave to amend the complaint.

Declaratory relief is not available because appellants failed to present a controversy susceptible to definitive and conclusive relief by declaratory judgment, and they have not identified a clear rule that was ignored or improperly applied. Mandamus is likewise unauthorized as appellants attack respondents' exercise of discretion rather than a failure to perform a ministerial duty or a quasi-legislative action. Since appellants assert no more than an abstract right to amend, it was within the trial court's discretion to dismiss without leave to amend. We shall affirm.

LEGAL BACKGROUND

The Porter-Cologne Act is the principal law governing water quality regulation in California. Enacted in 1969, the Porter-Cologne Act establishes as state policy that "the quality of all the waters of the state shall be protected for use and enjoyment by the

6

people of the state." (§ 13000.)  It provides that "activities and factors which may affect the quality of the waters of the state shall be regulated to attain the highest water quality, which is reasonable, considering all demands being made and to be made on those waters and the total values involved, beneficial and detrimental, economic and social, tangible and intangible." (*Ibid*.)

The Legislature designated the State Board and nine regional water quality control boards (regional water boards) as the agencies with primary responsibility for the regulation of water quality under the Porter-Cologne Act.  (§ 13001.)  The State Board formulates and adopts state-wide policy for water quality control, allocates funds, and oversees the activities of the regional water boards.  (§§ 13140, 13320.)  Each regional water board is responsible for, among other things, water quality protection, permitting, inspection, and enforcement actions within its region.  (§ 13225, subd. (a).)  The regional water boards formulate water quality management plans, known as "basin plans," which must conform to the State Board's policies.  (§ 13240.)  Basin plans identify beneficial uses of the water such as drinking water supply, fishing, agricultural water supply, and ecological functions.  (§ 13050, subd. (f).)  All beneficial uses must be protected. (§ 13241.)

The regional water boards are also responsible for issuing waste discharge permits. (§§ 13263, 13269.)  The State Board may review any regional water board's action or failure to act on such a permit either via petition from any aggrieved person.  (§ 13320, subd. (a).)  The State Board's decision on whether to review a regional water board's action or failure to act is not subject to judicial review.  (*Johnson v. State Water Resource Control Bd.* (2004) 123 Cal.App.4th 1107, 114.)

The Porter-Cologne Act also allows regional water board decisions on waste discharge permits to be challenged through a petition for writ of  mandate in superior court pursuant to Code of Civil Procedure section 1094.5.  (§ 13330, subds. (a), (b), (e).)

7

The Legislature has also directed the State Board to implement a "nonpoint source management plan." (§ 13369, subd. (b)(2).) Under this mandate, the State Board adopted the NPS Policy. The adoption of this policy is a quasi-legislative, rulemaking action. (*WaterKeepers Northern California v. State Water Resources Control Bd.* (2002) 102 Cal.App.4th 1448, 1452.) The NPS Policy regulations require nonpoint source pollution control permits to include five mandatory key elements. The elements are as follows: "(1) address NPS pollution in a manner that achieves and maintains water quality objectives and beneficial uses, including any applicable antidegradation requirements; (2) have a high likelihood that the program will attain water quality requirements, including consideration of the management practices to be used and the process for ensuring their proper implementation; (3) include a specific time schedule, and corresponding quantifiable milestones designed to measure progress toward reaching the specified requirements; (4) include sufficient feedback mechanisms to determine if the program is achieving its stated purpose; and (5) make clear, in advance, the potential consequences for failure to achieve the program's stated purposes." (*Monterey Coastkeeper v. State Water Resources Control Bd.* (2018) 28 Cal.App.5th 342, 349.)

FACTUAL AND PROCEDURAL BACKGROUND

Appellants filed a complaint and petition alleging two causes of action. The first cause of action, against respondent Central Coast Board, challenged the State Board's 2017 Conditional Waiver of Waste Discharge Requirements for Discharges from Irrigated Lands, Order No. R3-2017-0002, and the related monitoring and reporting program, via a petition for writ of administrative mandamus pursuant to section 13330 and Code of Civil Procedure section 1094.5. The second cause of action sought a writ of traditional mandamus and declaratory relief against the State Board directing it to comply with its obligations under law with respect to issuing or reviewing agricultural waste discharge permits and to take appropriate action when regional water boards have failed

8

to issue general agricultural orders or individual waste discharge requirements (WDR) for agricultural discharge.

According to the complaint, agricultural water pollution has harmed public health and ecological resources throughout California. Runoff from crop irrigation carries pollutants into creeks, rivers, and the ocean, and percolates into groundwater. Appellants alleged that this led to hundreds of thousands of Californians in rural communities lacking clean, safe water.

In support of the second cause of action, appellants alleged the regional water boards, either by adopting general agricultural orders or not issuing orders, systematically failed to ensure that the authorized discharges of agricultural pollutants do not cause or contribute to exceedance of water quality objectives, impairment of beneficial uses, or a condition of nuisance. Appellants further alleged the State Board failed to ensure the regional water boards' general agricultural orders complied with: NPS Policy, antidegradation requirements, various water quality objectives, adequate monitoring and reporting requirements; consider the impact of agricultural discharges on public trust resources or protect public trust resources when feasible; prevent unreasonable use or method of use of waters in violation of article X, section 2 of the state Constitution and sections 100 and 275, and implement and protect the human right to use water. The complaint also alleged the State Board failed to issue its own orders to meet these various requirements and failed to investigate or undertake any action with respect to ongoing violations of the Porter-Cologne Act. It alleged these systematic and continuous failures demonstrated a pattern of the State Board neglecting its duty to comply with the Porter-Cologne Act's mandate that water quality objectives be attained and maintained.

The State Board demurred to the second cause of action, asserting it failed to identify a ministerial duty supporting mandamus or a controversy susceptible to declaratory relief. The trial court sustained the demurrer with leave to amend.

9

Coastkeeper filed an amended complaint retaining the first cause of action, while adding three new causes of action. The second cause of action related to the 2018 agricultural waste discharge permit issued by the Central Valley Regional Water Control Board (Central Valley Board) and the State Board's modification of the permit. This cause of action added the Central Valley Board as a defendant and two new plaintiffs.

The third cause of action, brought against the Central Coast Board, Central Valley Board, and the State Board, alleged the regional water boards failed to comply with the NPS Policy in a manner that achieves and maintains water quality objectives and protects beneficial uses, including antidegradation requirements. In support, appellants alleged that the State Board and the two regional water boards have long been aware that agricultural discharges were degrading water quality and preventing the attainment of water objectives and, through various means, failed to take measures to address the problems. Either through action or inaction, the respondents were alleged to have systematically failed to comply with the NPS Policy. The complaint further alleged that the State Board's revisions or decisions to decline to revise general agricultural orders adopted by the regional water boards failed to comply with the NPS Policy, and that the State Board picked and chose whether to review regional water board orders in a manner avoiding compliance with the NPS Policy and evading judicial review. In addition, the respondents were alleged to have evaded their legal duties by repeatedly ignoring judgments of the trial court and the appellate court specifying their failures to comply with the NPS policy. The third cause of action sought declaratory relief that the respondents act in accordance with their legal obligations to protect public health and the environment, and traditional mandamus directing them to comply with their legal obligations with respect to the harm to state water quality caused by agricultural discharges.

The fourth cause of action addressed the State Board's duties under the public trust doctrine. It alleged the State Board had a continuing supervisory duty under the

10

public trust doctrine which it violated by failing to avoid or minimize harm associated with agricultural discharges. Appellants sought a writ of mandate directing the State Board to comply with its obligation to protect public trust resources and avoid or minimize harm caused by agricultural discharge.

Appellants alleged that the Central Valley Board's 1982 and 2003 waivers largely exempted agricultural operations or had no controls for pollution at the source, and that the 2003 waiver had been found to be inconsistent with antidegradation regulations. The renewal of the 2003 waiver led to additional litigation, resulting in a stipulated judgment with a 2011 deadline to establish a regulatory program for irrigated lands. The 2006 waiver was renewed in 2011, but the trial court found the renewed waiver did not comply with the NPS Policy or antidegradation regulations. A permit for the Eastern San Joaquin Regional Board allegedly also did not comply with the NPS Policy.

Respondents filed a motion to strike the second cause of action and a demurrer to the third and fourth causes. The motion to strike asserted the second cause of action should be stricken because it did not respond to the reason for sustaining the earlier demurrer, and new plaintiffs may be added only after petitioning to intervene. The demurrer asserted the third cause of action failed to identify a mandatory ministerial act, or failure to act to be controlled by writ, and did not identify a controversy amenable to declaratory relief. Respondents asserted the fourth cause of action fails because administration of the public trust necessarily involves discretion.

Following briefing and argument, the trial court granted the motion to strike the second cause of action and the new parties.[2] The court also sustained the demurrer to the third and fourth causes of action without leave to amend. The court found that appellants had not identified a mandatory, ministerial duty but instead brought a broad, generalized

---

[2] Appellants do not appeal this decision. The parties agreed to a stipulated judgment regarding the first cause of action, which likewise is not a subject of this appeal.

11

challenge to an agency's discretionary decisions.  The fact that appellants thought respondent's choices were not aggressive enough to achieve the state's water policy goals did not entitle them to relief.  Declaratory relief was not supported by the complaint because appellants had not identified a controversy that could be resolved by this type of action.  According to the court, appellants essentially sought "a declaration that Respondents' ongoing efforts to address non point source pollution and protect public trust resources are not sufficiently 'effective' and 'environmentally protective.' "  The trial court found this was "not the type of controversy that can, or should, be resolved by declaratory judgment."

## DISCUSSION

### I

### *Standard of Review*

"Because the function of a demurrer is to test the sufficiency of a pleading as a matter of law, we apply the de novo standard of review in an appeal following the sustaining of a demurrer without leave to amend.  [Citation.]  We assume the truth of the allegations in the complaint, but do not assume the truth of contentions, deductions, or conclusions of law.  [Citation.]  It is error for the trial court to sustain a demurrer if the plaintiff has stated a cause of action under any possible legal theory, and it is an abuse of discretion for the court to sustain a demurrer without leave to amend if the plaintiff has shown there is a reasonable possibility a defect can be cured by amendment.  [Citation.]" (*California Logistics, Inc. v. State of California* (2008) 161 Cal.App.4th 242, 247.)  "We will affirm the trial court's decision to sustain the demurrer was correct on any theory. [Citation.]"  (*Stonehouse Homes LLC v. City of Sierra Madre* (2008) 167 Cal.App.4th 531, 539.)

"When considering an appeal from a judgment entered after the trial court sustained a demurrer without leave to amend, we 'accept as true all well-pleaded facts in the complaint and give a reasonable construction to the complaint as a whole.'

[Citations.]  In addition, we may consider matters that are properly the subject of judicial notice, and were considered by the trial court.  [Citation.]" (*La Serena Properties, LLC v. Weisbach* (2010) 186 Cal.App.4th 893, 897.)

## II

### *Declaratory Relief*

Appellants contend the trial court erred in sustaining the demurrer as to declaratory relief by requiring more than allegations of respondents' ongoing failure to comply with the NPS Policy.

Declaratory relief is available to a party "who desires a declaration of his or her rights or duties with respect to another . . . ."  (Code Civ. Proc., § 1060.)  A complaint for declaratory relief is legally sufficient if it sets forth facts showing the existence of an actual controversy relating to the legal rights and duties of the parties and requests that the rights and duties of the parties be adjudged by the court.  If these requirements are met and no basis for declining declaratory relief appears, the court should declare the rights of the parties whether or not the facts alleged establish the plaintiff is entitled to favorable declaration.  (*Ludgate Ins. Co. v. Lockheed Martin Corp.* (2000) 82 Cal.App.4th 592, 606.)  "Declaratory relief operates prospectively, serving to set controversies at rest before obligations are repudiated, rights are invaded or wrongs are committed.  Thus the remedy is to be used to advance preventative justice, to declare rather than execute rights.  [Citation.]" (*Kirkwood v. California State Automobile Assn. Inter-Ins. Bureau* (2011) 193 Cal.App.4th 49, 59.)  In essence, declaratory relief operates to declare future rights, not to address past wrongs.  (*Canova v. Trustees of Imperial Irrigation Dist. Employee Pension Plan* (2007) 150 Cal.App.4th 1487, 1497.)

A party seeking declaratory relief must show a very significant possibility of future harm.  (*Coral Construction, Inc. v. City and County of San Francisco* (2004) 116 Cal.App.4th 6, 17.)  In assessing whether declaratory relief is available, a court determines whether "a probable future dispute over legal rights between parties is

13

sufficiently ripe to represent an 'actual controversy' within the meaning of the statute authorizing declaratory relief (Code Civ. Proc., § 1060), as opposed to purely hypothetical concerns . . . ." (*Steinberg v. Chiang* (2014) 223 Cal.App.4th 338, 343.) "An 'actual controversy' under the declaratory relief statute is 'one which admits of definitive and conclusive relief by judgment within the field of judicial administration, as distinguished from an advisory opinion upon a particular or hypothetical state of facts.' [Citation.]" (*Gilb v. Chiang* (2010) 186 Cal.App.4th 444, 459.)

The trial court summed up appellants' claims thusly: "The gravamen of Petitioners' complaint is that, despite years of regulating agricultural discharges, Respondents have failed to take meaningful steps to regulate agricultural discharges in a manner that would achieve and maintain water quality objectives and protect beneficial uses. Petitioners specifically allege that Respondents knowingly and systematically have failed to address nonpoint source pollution and protect public trust resources."

We agree with this summation and with the trial court's conclusion that this type of claim cannot support declaratory relief. Appellants' complaint asserted that one means by which the State Board systematically fails to abide by the NPS Policy is through its decisions on whether to review regional water board actions. The State Board's decision to review a regional water board action is entirely within the State Board's discretion and not subject to judicial review. (*Johnson v. State Water Resources Control Bd., supra*, 123 Cal.App.4th at p. 1114.) Using declaratory relief to force the State Board to exercise its discretion in a particular manner cannot be squared with this principle. More importantly, the complaint does not allege a dispute amenable to resolution through declaration.

Declaratory relief requires a court to have "narrow, precise questions to guide its examination, without which it is unable to 'decree, and not suggest, what the parties may or may not do.' [Citation.]" (*Zetterberg v. State Dept. of Public Health* (1974) 43 Cal.App.3d 657, 664.) The NPS Policy is a complex matter which will take

14

substantial time to resolve and will necessarily require different approaches in different localities.[3]  An issue as intricate and complex as water pollution from agricultural runoff cannot be "solved" by a court decree in a declaratory relief action.

Appellants argue declaratory relief is available because they have alleged a mandatory duty to follow the NPS Policy and that respondents have systematically ignored this duty for decades.  They find their claim for declaratory relief supported by *Californians for Native Salmon etc. Assn. v. Department of Forestry* (1990) 221 Cal.App.3d 1419 (*Native Salmon*) and *Venice Town Council, Inc. v. City of Los Angeles* (1996) 47 Cal.App.4th 1547 (*Venice Town Council*).  Neither case supports the declaratory relief sought here.

*Native Salmon* and *Venice Town Council* allowed declaratory action where an agency has an alleged policy or pattern and practice of ignoring applicable laws.  In *Native Salmon*, the plaintiffs alleged the Department of Forestry violated state law and the relevant implementing regulations by approving timber harvesting plans without notice to the public or responding to significant environmental objections and failing to consider the cumulative environmental impact of timber harvesting.  (*Native Salmon, supra*, 221 Cal.App.3d at pp. 1424-1425.)  According to the plaintiffs, this was a "quasi-legislative policy" set by the agency.  (*Id*. at p. 1429.)  The First District Court of Appeal found that a quasi-legislative policy of applying or interpreting a statute or rule in a

---

[3]  "The NPS Policy recognizes that the 'challenges to implementing statewide prevention and control of NPS pollution discharges are significant.'  'Current land use management practices that have resulted in NPS pollution have a long and complicated physical, economic and political history. . . .  Therefore, it is expected that it will take a significant amount of time for the [regional water boards] to approve or endorse NPS control implementation programs throughout their regions, and even longer for those programs to achieve their objectives.'  'Most NPS management programs typically depend, at least in part, upon discharger implementation of management practices (MPs) to control nonpoint sources of pollution.' "  (*Monterey Coastkeeper v. State Water Resources Control Bd., supra*, 28 Cal.App.5th at p. 349.)

particular manner was subject to declaratory action. (See *ibid*.; *Bess v. Park* (1955) 132 Cal.App.2d 49, 52-54 [declaratory relief available to "any interested person" to review "any rule, regulation, order or standard of general application adopted by any state agency to implement, interpret or make specific, any law enforced or administered by it . . . ."].) Allowing a declaratory action to proceed also served judicial economy by avoiding piecemeal litigation of these issues. (*Native Salmon*, at p. 1430.) The trial court therefore erred in granting the demurrer to the declaratory action. (*Id.* at pp. 1430-1431.)

*Venice Town Council* involved a dispute over whether the Mello Act (Gov. Code, §§ 65590 & 65590.1) mandated local governments to "require developers to replace residential units, or pay an in-lieu fee, whenever they demolish or convert dwelling units occupied by low or moderate-income persons in the coastal zone." (*Venice Town Council, supra*, 47 Cal.App.4th at p. 1552.) Plaintiffs alleged the City misinterpreted the relevant law "by subjecting every decision to a feasibility standard," and, notwithstanding a formal policy of complying with the Mello Act, "the City has an informal policy of nonenforcement in violation of the Mello act." (*Id.* at p. 1565.) The Second District Court of Appeal found the "complaint properly alleges a present and actual controversy whether the City's interpretation of [Government Code] section 65590 and the duties that statute imposes on local governments is erroneous, and whether it has an informal policy of nonenforcement of the Mello act. The City's interpretation of its responsibilities under the Mello act is a recurring problem and one involving the interpretation of a statute. The proper interpretation of a statute is a particularly appropriate subject for judicial resolution. [Citations.]" (*Id*. at p. 1566.) Noting that *Native Salmon* found declaratory relief is available "when it is alleged an agency has a policy of ignoring or violating applicable laws," (*ibid*.) the *Venice Town Council* court concluded that the cause of action stated grounds for declaratory relief. (*Id*. at p. 1567.)

While we must accept all factual allegations in the complaint as true, a reviewing court "may not consider conclusions of fact or law, opinions, speculation or allegations

16

which are contrary either to law or to judicially noticed facts.  [Citations.]" ( *Long Beach Equities v. County of Ventura* (1991) 231 Cal.App.3d 1016, 1024; accord, *City of Chula Vista v. County of San Diego* (1994) 23 Cal.App.4th 1713, 1718-1719; see also *Shea Homes Limited Partnership v. County of Alameda* (2003) 110 Cal.App.4th 1246 [applying rule to analogous review of judgment on pleadings]; *Bettencourt v. Hennessy Industries, Inc*. (2012) 205 Cal.App.4th 1103, 1111 [same].)

The trial court granted respondents' request to take judicial notice of the State Board's 2018 Waste Discharge Requirements General Order No. RS-2012-0116, Order WQ 2018-002, upholding the Central Valley Board's WDR for growers in the East San Joaquin Valley.  In that document, the State Board acknowledges the permit must conform to the NPS Policy.  The order also analyzes the NPS Policy and makes specific findings in support of its conclusion that the East San Joaquin Valley order is consistent with the NPS Policy.  For example, the order noted efforts by the Central Valley Board to address salt and nitrate impacts.[4]  The order also discussed how the NPS Policy guides

---

[4]  The order stated:

"[W]ith regard to implementation consistent with the water quality control plans within the Central Valley region, the State Water Board recognizes that considerations regarding mixing, averaging periods, time schedules, and the implementation of cooperative monitoring and compliance strategies are currently being considered as part of the effort to address salt and nitrate impacts through the Central Valley Salinity Alternatives for Long-term Sustainability Initiative (CV-SALTS), a collaborative, stakeholder process initiated by the Central Valley Water Board.  This initiative, which is in the final phases of development, is intended to establish a Central Valley-wide salt and nitrate control program based on recommendations from the CV-SALTS-developed Salt and Nitrate Management Plan (SNMP).  To implement the SNMP, the Central Valley Water Board is considering amendments to the Water Quality Control Plans for the Sacramento River and San Joaquin River Basins and the Tulare Lake Basin.  These amendments, as currently contemplated, would incorporate new implementation plans, strategies, policies and guidance into the water quality control plans.  Because the State Water Board has not yet been presented the CV-SALTS-driven water quality control plan amendments for review, it is premature for us in this order to opine on how any approved new direction

17

the State Board's interpretation and implementation of the Water Code's requirements regarding nonpoint source discharges. It found the Central Valley Board's WDR's complied with key element one of the NPS Policy by establishing water quality requirements and making water limitations effective immediately unless a member was implementing an approved plan with an approved timeline. The WDR's also complied with key element three by setting a maximum time limit of 10 years for a nonpoint source program, requires the third party to propose (with technical or economic justification) a schedule that is as short as practicable, and requiring the plans to incorporate a specific schedule and milestones for the implementation of management practices and tasks and measurable performance goals.

The State Board recognized that key element one required not just setting objectives, but also mandated programs to address nonpoint source pollution in a manner that achieves and maintains water quality objectives and beneficial uses. Accordingly, the regional water boards must not just set water quality objectives but must also determine that there is a high likelihood the program will attain the regional water boards' stated objectives. The State Board recognized that "a broad scale nonpoint source regulatory program does not necessarily generate the type of data that facilitates easy determination and enforcement of compliance with receiving water limitations" because "monitoring the numerous and sometimes indeterminate set of all farm discharge points to surface water and groundwater is an impractical, prohibitively costly, and often ineffective method for compliance determination and the Non point Source Policy accordingly does not mandate such monitoring." It found that management practice

---

may affect implementation of the Eastern San Joaquin Agricultural General WDRs or the remainder of the Central Valley Regional Board irrigated lands regulatory program. However, the State Water Board acknowledges the extensive effort by the Central Valley Water Board and stakeholders to study and develop alternatives to address existing groundwater salinity problems in the Central Valley."

18

implementation was not a substitute for compliance, but "a schedule of management practice implementation, assessment, and adaptive management may act as a proxy for assessing regulatory program progress."

This conclusion was consistent with the NPS Policy's key element two's requirement that the program describe management practices, program elements, and the necessary processes to implement them, as well as key element four's requirement of sufficient feedback mechanisms. The WDR's at issue required members to implement management practices to "1) minimize waste discharge offsite in surface water; 2) minimize percolation of waste to groundwater; and 3) protect wellheads from surface water intrusion," to prepare farm evaluations to document implemented practices, and, where necessary, act similarly with regard to nitrogen management as well as erosion and sediment control. The Central Valley Board's WDR appropriately used third parties to collect data on management practices and reported every year to the Central Valley Board regarding "the degree of implementation of management practices and evaluation of the [e]ffectiveness of the management practices with the data in aggregated form." The State Board engaged in similar analysis and detailed findings regarding the WDR's with respect to the other key elements of the NPS Policy.

We need not (and do not) accept the conclusions of the State Board order regarding whether the WDR's complied with the NPS Policy. However, we cannot ignore this judicially noticed evidence that the State Board and the Central Valley Board do not ignore or refuse to implement the NPS Policy. A quasi-legislative policy of ignoring or refusing to apply relevant law as was done in *Native Salmon* and *Venice Town Council* is not consistent with the findings and analysis on the State Board order. Those findings and analysis may be wrong with regard to whether the WDR's are consistent with the requirements of the NPS Policy or the Port-Cologne Act, but a dispute over the correctness of these decisions is not amenable to declaratory relief.

19

Declaratory relief generally is not available to use the courts to tell an administrative agency how to do its job. An action for declaratory relief "does not confer upon the court the authority to make pronouncements in a field reserved to other branches of government. [Citation.]" (*Bautista v. State of California* (2011) 201 Cal.App.4th 716, 734.) Such is the case here. Although the complaint generally alleges a pattern and practice of ignoring or not implementing the NPS Policy, at its heart, the complaint contests the effectiveness of the State Board's and local regional water boards' efforts to implement the policy. This will not support an action for declaratory relief, and the trial court did not err in sustaining the demurrer with regards to the declaratory relief action here.

III

*No Mandamus*

Appellants also contend the trial court erred in sustaining the demurrer to their traditional mandamus actions in their second and third causes of action. They claim the two causes stated claims for mandamus relief to correct respondents' continuing illegal practice of failing to comply with the NPS Policy and the State Board's "utter failure of its duty to consider the public trust doctrine." They claim the trial court erred in failing to recognize respondents' respective duties under the NPS Policy and public trust doctrine are mandatory.

This is an action under section 1085 of the Code of Civil Procedure, which provides in pertinent part: "A writ of mandate may be issued by any court to any inferior tribunal, corporation, board, or person, to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station, or to compel the admission of a party to the use and enjoyment of a right or office to which the party is entitled, and from which the party is unlawfully precluded by that inferior tribunal, corporation, board, or person." (Code Civ. Proc., § 1085, subd. (a).) "Two basic requirements are essential to the issuance of the writ: (1) A clear, present and usually

20

ministerial duty upon the part of the respondent [citations]; and (2) a clear, present and beneficial right in the petitioner to the performance of that duty [citation]. [Citation.]" (*People ex rel. Younger v. County of El Dorado* (1971) 5 Cal.3d 480, 491.) "A ministerial act is one that a public functionary ' " 'is required to perform in a prescribed manner in obedience to the mandate of legal authority,' " ' without regard to his or her own judgment or opinion concerning the propriety of such act. [Citation.] 'Thus, "[w]here a statute or ordinance clearly defines the specific duties or course of conduct that a governing body must take, that course of conduct becomes mandatory and eliminates any element of discretion." ' [Citation.]" (*Ellena v. Department of Insurance* (2014) 230 Cal.App.4th 198, 205.) " 'Discretion, on the other hand, is the power conferred on public functionaries to act officially according to the dictates of their own judgment.' [Citation.]" (*Transdyn/Cresci JV v. City and County of San Francisco* (1999) 72 Cal.App.4th 746, 752.)

### A. NPS Policy

Appellants' claim regarding the NPS Policy fails because, like the action for declaratory relief, it is, in essence, based on the alleged failure of respondents to do enough to comport with the NPS Policy. Application of the NPS Policy necessarily involves discretionary acts by the local and state boards. The NPS Policy statement recognizes the discretion inherent in applying this policy: "[Regional Water Boards] have broad flexibility and discretion in using their administrative tools to fashion NPS management programs, and are encouraged to be as innovative and creative as possible, and, as appropriate, to build upon Third-Party Programs. The State Board, in turn, is encouraged to establish a program that recognizes and honors successful and outstanding third-party efforts." Application of the NPS Policy is a quintessentially discretionary task not subject to traditional mandamus.

In support of their claim, appellants rely on two cases allowing petitioners to challenge administrative decisions under both traditional and also administrative

21

mandamus. (Code Civ. Proc., § 1094.5.) *Conlan v. Bonta* (2002) 102 Cal.App.4th 745 (*Conlan*) addressed claims that the State Department of Health Services (DHS) failed to reimburse the plaintiffs for payments they made while their Medi-Cal applications were pending. (*Id*. at p. 748.) The First District Court of Appeal held "that the state has failed to establish a reasonable procedure by which recipients may obtain prompt reimbursement for covered services for which they paid during the three months prior to applying for Medi-Cal coverage, as required by federal law, and that DHS therefore should have been ordered to take appropriate measures to ensure that at least two of the petitioners receive their reimbursement." (*Id*. at p. 749.) DHS had no procedure in place to allow a recipient to obtain reimbursement from the provider or the government for expenses incurred while eligibility was pending in spite of a legal obligation to ensure the recipient was reimbursed. (*Id.* at pp. 754-756.) Traditional mandamus was therefore appropriate, as it challenged "the agency's practice of refusing to directly reimburse Medi-Cal recipients under circumstances in which DHS assertedly is required to do so." (*Id*. at p. 752.)

Timmons v. McMahon (1991) 235 Cal.App.3d 512 (*Timmons*) involved an action by a temporary guardian of children to obtain benefits under the state-mandated Aid to Families with Dependent Children-Foster Care (AFDC-FC) program for the period when she was the children's guardian. (*Id*. at p. 514.) The petitioner filed a claim for administrative mandamus to obtains benefits for the period of her guardianship, and also sought traditional mandamus "to correct the Department's eligibility policies so that otherwise eligible applicants would not be denied benefits solely because they were temporary rather than permanent guardians." (*Ibid.*) The department denied the claim for benefits solely because the petitioner was a temporary rather than permanent guardian. (*Id*. at pp. 514-515.) When an administrative law judge ruled the statutory scheme distinguish between temporary and permanent guardians, the department rejected the decision and issued a decision denying the claim because the petitioner was a

temporary guardian. (*Id*. at p. 515.) In granting administrative mandamus, the trial court found the department had a policy and practice of distinguishing between temporary and permanent legal guardians for the purpose of establishing AFDC-FC eligibility, which violated the controlling statutes. (*Ibid*.)

The First District Court of Appeal found traditional mandate was appropriate in this case. (*Timmons, supra*, 235 Cal.App.3d at p. 517.) The petition addressed the department's "*legal interpretation* of the relevant eligibility requirements." (*Ibid*.) The department's legal interpretation that led to the improper denial of the petitioner's claim was based in part on a misleading departmental regulation. (*Ibid*.) Since the policy of denying AFDC-FC benefits to temporary guardians violated the relevant statutes, traditional mandamus was appropriate to compel the department to conform to the law. (*Id*. at p. 518.)

As we have previously discussed, respondents do not have a policy denying that the NPS Policy applies to and governs their actions. The real dispute regards the sufficiency of those actions, which distinguishes *Timmons* and *Conlan*, and is the reason the trial court was correct with respect to sustaining the demurrer on the third cause of action.

*B. Public Trust Doctrine*

Under the public trust doctrine, the state "holds all of its navigable waterways and the lands lying beneath them 'as trustee of a public trust for the benefit of the people.' [Citations.]" (*Colberg, Inc. v. State of California ex rel. Dept. of Public Works* (1967) 67 Cal.2d 408, 416.) The state has the " 'duty . . . to protect the people's common heritage of streams, lakes, marshlands and tidelands, surrendering that right of protection only in rare cases when the abandonment of that right is consistent with the purposes of the trust.' " (*San Francisco Baykeeper, Inc. v. State Lands Com.* (2015) 242 Cal.App.4th 202, 234, quoting *National Audubon Society v. Superior Court* (1983) 33 Cal.3d 419, 441 (*National Audubon*).) "The state has an affirmative duty to take the public trust into

23

account in the planning and allocation of water resources, and to protect public trust uses whenever feasible." (*National Audubon,* at p. 446, fn. omitted.)

Appellants argue the State Board had a mandatory duty to apply the doctrine and their allegation that the State Board had public trust obligations with regard to both individual permits and to the entire program governing irrigated agriculture supported mandamus relief. (See *Environmental Law Foundation v. State Water Resources Control Bd.* (2018) 26 Cal.App.5th 844, 862 [public trust doctrine applies to State Board in conjunction with the Water Code].) They note the claim alleges the existence of a public trust duty, the many public uses under threat, the failure of all of the many agricultural permits to consider the impacts of the permits or program on the public trust resources, and to the failure protect and avoid or minimize harm to public trust resources to the extent feasible, and find that this supports traditional mandamus.

As the Supreme Court found in *National Audubon* and appellants admit in the trial court and on appeal, public trust uses are to be protected wherever *feasible*. The public trust resources therefore need not be protected under every conceivable circumstance, but only in those where protection or harm minimization is feasible. "As a matter of practical necessity the state may have to approve appropriations despite foreseeable harm to public trust uses." (*National Audubon, supra*, 33 Cal.3d at p. 446.) The public trust doctrine necessarily involves the exercise of discretion by state agencies. "[T]he state is free to choose between public trust uses and that selecting one trust use 'in preference to . . . [an]other cannot reasonably be said to be an abuse of . . . discretion.' [Citation.]" (*Citizens for East Shore Parks v. State Lands Com.* (2011) 202 Cal.App.4th 549, 577.) Accordingly, the relevant governing case law does not "impress into the public trust doctrine any kind of procedural matrix." (*Id.* at p. 576.)

This inherently discretionary doctrine generally does not allow for intervention by the courts other than in the context of judicial review of administrative decisions.[5] " 'Intervention by the courts [through a separate lawsuit under the public trust doctrine], other than by exercising oversight over the administrative process and ensuring that proper standards are applied, not only would threaten duplication of effort and inconsistency of results, but would require courts to perform an ongoing regulatory role as technology evolves and conditions change.' [Citation.]" (*Citizens for East Shore Parks v. State Lands Com., supra*, 202 Cal.App.4th at pp. 577-578.)

Appellants' fourth cause of action, which would require the State Board to protect public trust resources statewide, is particularly ill-suited to traditional mandamus. Simply ordering the State Board to apply the public trust doctrine would be an empty judgment, while actually determining whether the State Board is properly applying the doctrine would necessarily require the trial court to consider the many decisions within the State Board's mandate, decisions that will typically require the exercise of administrative discretion and will often require technical expertise.

When ruling on the demurrer to the first petition, the trial court stated: "But isn't that just such an open-ended remedy, where I say, 'Okay, I order you guys to follow the law,' and then what?  You guys come back in two or three months and say, 'Judge, they're not following the law, they're not doing what you told them to do.  The law says this and they're not following it.'  [¶]  I mean, it would be ongoing—I would be a

---

[5]  A narrow exception exists where there is an unresolved question regarding whether the public trust doctrine applies in a particular context.  (See *Environmental Law Foundation v. State Water Resources Control Bd, supra*, 26 Cal.App.5th at pp. 851-852 [addressing in the absence of administrative decision "extraordinarily narrow" issue of whether government entities have "common law fiduciary duties to consider the potential adverse impact of groundwater extraction on the Scott River, a public trust resource, when issuing well permits"].)  No such narrow question is present here.

receiver. I would be sitting on top of them—I'd be—I'd be reviewing everything they did, to make sure they're following the law."

The trial court was right. Traditional mandamus in this case would make the trial court the effective overseer of the State Board and the regional water boards, making the court one of the most, if not the most, powerful entities in setting water policy. The causes of action here cannot support such a result.

IV

*Leave to Amend*

Appellants' final contention is the trial court erroneously denied them leave to amend the complaint.

"Where, as here, the trial court sustains the demurrer without leave to amend, we must decide whether there is a reasonable possibility the plaintiff can cure the defect with an amendment. [Citation.] If we find that an amendment could cure the defect, we must find the court abused its discretion and reverse. If not, the court has not abused its discretion." (*Mendoza v. JPMorgan Chase Bank, N.A.* (2016) 6 Cal.App.5th 802, 809.) It is well settled that, on appeal, the plaintiff bears the burden of proving an amendment would cure the defect. (*Ibid.; Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081.)

Appellants have not proposed an amendment that would cure the defects. We accordingly conclude the trial court was within its discretion to deny leave to amend.

DISPOSITION

The judgment is affirmed.  Costs on appeal to respondent State Board.  (Cal. Rules of Court, rule 8.278(a).)

                                         \s\                    ,
                                    BLEASE, J.


We concur:


        \s\            ,
RAYE, P. J.


        \s\            ,
HULL, J.


27

Filed 3/7/2022

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| MONTEREY COASTKEEPER et al., | C090943 |
| Plaintiffs and Appellants, | (Super. Ct. No. 34-2017-80002655-CU-WM-GDS) |
| v. | |
| CENTRAL COAST REGIONAL WATER QUALITY CONTROL BOARD et al., | ORDER CERTIFYING OPINION FOR PUBLICATION |
| Defendants and Respondents. | |

THE COURT:

The opinion in the above-entitled matter filed on February 10, 2022, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

28

EDITORIAL LISTING

APPEAL from a judgment granting a petition for writ of mandate of the Superior Court of Sacramento County, James P. Arguelles, Judge. Affirmed.

Environmental Law and Justice Clinic; Helen H. Kang, Lucas Williams, Deborah A. Sivas and Susann M. Bradford for Plaintiffs and Appellants, Monterey Coastkeeper, California Sportsfishing Protection Alliance, Environmental Justice Coalition for Water, Pacific Coast Federation of Fisherman's Associations, Institute for Fisheries Resources, California Coastkeeper Alliance, Santa Barbara Channelkeeper, Orange County Coastkeeper, and Inland Empire Waterkeeper.

California Rural Legal Assistance, Inc.; Marisol F. Aguilar; for Plaintiffs and Appellants, Fairmead Community and Friends and Planada En Acción.

Xavier Becerra, Attorney General, Robert W. Byrne, Senior Assistant Attorney General, Tracy L. Windsor, Supervising Deputy Attorney General, Taylor Rhodes, Sierra Arballo and Linda Gándara, Deputy Attorneys General for Defendants and Respondents, Central Coast Regional Water Quality Control Board, et al.

Kahn, Soares & Conway, Theresa A. Dunham, for East San Joaquin Water Quality Coalition; Spaletta Law; Jennifer Lynn Spaletta, for San Joaquin County Resource Conservation District, Kaweah Basin Water Quality Association, Tule Basin Water Quality Coalition, and California Farm Bureau Federation; Kari E. Fisher, for California Farm Bureau Federation as Amici Curiae on behalf of Defendants and Respondents.

BY THE COURT:

       \s\_____ ,
BLEASE, J.

       \s\_____ ,
RAYE, P. J.

       \s\_____ ,
HULL, J.